EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>    Peticionario<br><br>        v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, *et als*.<br><br>    Promovidos<br>———————————————<br>Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>    Recurrido<br><br>        v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, *et als*.<br><br>    Peticionarios | 2020 TSPR 142<br><br>205 DPR \_\_\_\_\_ |

Número del Caso:  CT-2020-24
                  CT-2020-25


Fecha:  23 de noviembre de 2020


Abogados de la parte peticionaria:

    Lcdo. Manuel A. Rodríguez Banchs
    Lcdo. Luis José Torres Asencio


Abogados de la Parte Recurrida:

    Lcdo. Jason Caraballo Oquendo
    Lcdo. Félix R. Passalacqua Rivera

Abogados de las partes con interés:

**Comisionado Electoral del Partido
Proyecto Dignidad**

Lcdo. Germán R. Ufret Pérez

**Comisionado Electoral del Partido
Popular Democrático**

Lcdo. Jorge Martínez Luciano
Lcdo. Emil Rodríguez Escudero
Lcdo. Gerardo De Jesús Annoni

**Comisionado Electoral del Partido
Nuevo Progresista**

Lcdo. Carlos E. Rivera Justiniano
Lcdo. Francisco J. González Magaz

**Comisionado Electoral
Partido Independentista Puertorriqueño**

Lcdo. Juan Manuel Mercado Nieves


Abogados del Interventor:

Lcdo. Javier A. Vega Villalba
Lcda. Myriam C. Ocasio Arana




Materia:  Derecho electoral - El Escrutinio General no puede ser paralizado, excepto lo dispuesto por el Código Electoral.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>Peticionario<br><br>v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>Promovidos | CT-2020-0024<br>Cons.<br>CT-2020-0025 |  |
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>Recurrido<br><br>v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>Peticionarios |  |  |

PER CURIAM

San Juan, Puerto Rico, a 23 de noviembre de 2020.

A tres (3) semanas de concluido el ejercicio del derecho al voto por el Pueblo de Puerto Rico, es un hecho

irrefutable que no se ha completado el Escrutinio General de los votos de tan siquiera uno (1) de los ciento diez (110) precintos. Ello, a pesar del claro mandato legislativo de que tal escrutinio no puede ser paralizado. Ante ese cuadro, resulta imperativo que este Tribunal intervenga oportunamente para precisar el alcance y los efectos jurídicos de la Sentencia emitida por el Tribunal de Primera Instancia, en el caso ante nos, y para descontinuar las acciones y omisiones administrativas de algunos funcionarios electorales, que han desvirtuado y dilatado irrazonablemente la naturaleza del Escrutinio General que ordinariamente se realiza en toda elección general.

Veamos los hechos que originan nuestra urgente intervención.

## I.

Como es de conocimiento público, el pasado 3 de noviembre se celebraron las elecciones generales en Puerto Rico, junto con el plebiscito. En consecuencia, la Comisión Estatal de Elecciones (CEE) notificó unos resultados preliminares del proceso electoral. Conforme dicta el Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, (http://www.bvirtual.ogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/58-2020.pdf) (Código Electoral), procedía el inicio del Escrutinio General a los fines de lograr un resultado final y oficial de nuestro evento electoral.

Ahora bien, al inicio del Escrutinio General, el Comisionado Electoral del Movimiento Victoria Ciudadana (MVC), Lcdo. Olvin A. Valentín Rivera, presentó una

acción de mandamus ante el Tribunal de Primera Instancia dirigida al Presidente de la CEE, Hon. Francisco Rosado Colomer.[1] Específicamente, solicitó la entrega de las listas oficiales digitales de los solicitantes del voto ausente y del voto adelantado. A su vez, solicitó, como medida provisional, la paralización del Escrutinio General y del conteo manual de los votos adelantados. En la alternativa, solicitó la segregación de todos los votos contados manualmente y que se mantuvieran íntegros los sobres hasta el momento en que se produjera la información solicitada.

En respuesta, el Presidente de la CEE y los distintos comisionados electorales, presentaron sus respectivos escritos. Tanto el Presidente de la CEE, como los Comisionados Electorales del Partido Nuevo Progresista (PNP) y del Proyecto Dignidad (PD) se opusieron a la solicitud de mandamus. En síntesis, plantearon que el Presidente de la CEE no se había negado a la petición del Comisionado Electoral del MVC, sino que no se le brindó un tiempo razonable para ello, lo que se discutió en varias de las reuniones de la CEE. Además, destacaron que cada partido político tiene un representante en la Junta Administrativa de Voto Ausente y Adelantado (JAVAA), lo que implicaba que el Comisionado Electoral del MVC tenía conocimiento de la información solicitada. A su vez, señalaron que las listas de los votantes que habían solicitado voto ausente y adelantado

---

[1] Los comisionados electorales de los restantes partidos políticos fueron incluidos como parte indispensable.

ya habían sido entregadas a los representantes de cada partido político desde mediados del mes de octubre y que parte de la información solicitada no estaba disponible porque se iría obteniendo durante el proceso del Escrutinio General.[2] En particular, el Comisionado Electoral del PNP también indicó que no procedía la paralización del Escrutinio General, según solicitada por el Comisionado Electoral del MVC, por ser contraria al mandato expreso del Código Electoral. Por su parte, el Comisionado Electoral del Partido Popular Democrático (PPD) se unió a la solicitud de mandamus.

Tras celebrarse una vista mediante videoconferencia el 17 de noviembre de 2020, al día siguiente, el Tribunal de Primera Instancia emitió la Sentencia objeto del presente recurso. El tribunal precisó que, luego de reunirse las partes, la controversia se centraba en la entrega de dos (2) listas: "(1) lista actualizada de los electores que solicitaron el voto ausente y el voto por adelantado; y (2) listas de electores que la CEE ha avalado que han votado bajo esas modalidades".[3] Así, al evaluar si existía un deber ministerial por parte del Presidente de la CEE en la entrega de tales listas, el foro primario hizo referencia al Manual de Procedimientos de la Unidad de Añadidos a Mano Elecciones Generales y Plebiscito 2020, de 11 de noviembre de 2020. Acorde con este Manual, en el proceso de investigar estos votos, se cotejan los mismos

---

[2]Durante el proceso, el Presidente de la CEE refirió a las partes y al tribunal una Certificación final de la lista de los solicitantes de voto por adelantado provista por la Oficina de Sistemas de Información y Procesamiento Electrónico (OSIPE).

[3]Sentencia del Tribunal de Primera Instancia, pág. 4.

con las listas de voto por correo, a domicilio, adelantado y ausente. Basado en ello, el Tribunal de Primera Instancia determinó que, en efecto, existía un deber ministerial por parte de la CEE de entregar las listas a los partidos políticos para que pudieran realizar el Escrutinio General. De este modo, señaló que, según la información provista en la vista, tales listas se encontraban en los maletines de cada precinto. Así, destacó que entregar las listas, una vez finalizado el Escrutinio General, resultaría en un ejercicio de futilidad. A fin de cuentas, la disposición del Tribunal de Primera Instancia es la siguiente:

> Cónsono con lo expresado, se declara HA LUGAR el recurso de mandamus. En consecuencia, se ordena a la CEE por conducto de su Presidente Hon. Francisco Rosado Colomer, que cumpla su deber ministerial de entregar a la parte demandante y a cada Comisionado electoral de los partidos políticos, las listas de los electores que votaron en todas las modalidades de voto ausente y adelantado **inmediatamente se abran los maletines para cada uno de los precintos electorales, al iniciar el proceso de escrutinio general**. (Énfasis suplido).[4]

Al siguiente día, el Comisionado Electoral del MVC presentó una moción urgente en la que alegó que el Presidente de la CEE no cumplió con la orden del tribunal y que la información de que las aludidas listas estaban en los maletines era falsa. Basado en ello, solicitó la celebración de una vista de desacato. A raíz de tales planteamientos, el Tribunal de Primera Instancia ordenó la celebración de una vista mediante videoconferencia para hoy lunes 23 de noviembre de 2020 a las 2:30 p.m.,

---

[4]Sentencia del Tribunal de Primera Instancia, pág. 10.

la cual quedó paralizada con nuestra intervención en este caso.

Posteriormente, el viernes 20 de noviembre de 2020, el Comisionado Electoral del PNP presentó una moción de reconsideración de la sentencia antes resumida. Su petición fue dirigida a aclarar el alcance y manejo de tal dictamen en tres (3) aspectos principales: el acceso a información confidencial de los electores; el manejo de las listas por parte de los funcionarios y funcionarias electorales y; la intromisión indebida con el proceso *per se* del escrutinio. En particular, solicitó una orden protectora para que las listas en cuestión se usaran exclusivamente para el proceso de adjudicación de los votos, que no se pudieran sacar ni física ni digitalmente del lugar donde se está procesando dicha adjudicación y que cuando se culminara el proceso fuesen decomisadas. A ello, añadió que el tribunal debía aclarar que la orden de tal divulgación o entrega no podía paralizar, atrasar u obstaculizar el proceso de escrutinio que se estaba llevando a cabo.

Ese mismo día, el Comisionado Electoral del PNP presentó electrónicamente, a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC), la <u>Solicitud de certificación intrajurisdiccional</u>, junto con una moción en auxilio de jurisdicción, dirigidos ambos escritos a este Foro.[5] En el auto de certificación, se

_____

[5] Como cuestión de hecho, por motivo del plan de reducción de gastos de la Rama Judicial, se había decretado previamente un cierre total, para el 20 de noviembre de 2020, del Tribunal Supremo de Puerto Rico, lo que implicaba la imposibilidad de presentar físicamente tal petición. No obstante, sabido es el

invoca la intervención de este Tribunal para interpretar el alcance del dictamen del foro primario, toda vez que fue objeto de diversas interpretaciones por parte de los distintos funcionarios o representantes de los cinco (5) partidos políticos al momento presentes. A su vez, eso ha provocado un disloque innecesario sobre el proceso del Escrutinio General, que ha impedido culminar exitosamente y lo más pronto posible este ciclo electoral.

Al tomar conocimiento judicial de tal presentación y en virtud del Art. 3.002(f) de la Ley de la Judicatura de 2003, Ley Núm. 201-2003, según enmendada, 4 LPRA sec. 24s(f), y el Art. 13.3 (4) del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, el mismo viernes, 20 de noviembre de 2020, procedimos a certificar el caso Valentín Rivera v. Rosado Colomer, SJ2020CV06084. Asimismo, se le concedió a las restantes partes hasta el domingo, 22 de noviembre a las 11:00 a.m., para expresar su posición respecto a este recurso.

Por su parte, el Presidente de la CEE también presentó una petición de certificación, junto con una moción en auxilio de jurisdicción y solicitud de remedios. En sus escritos, el Presidente de la CEE también sugiere varias medidas protectoras dirigidas a salvaguardar el proceso en sí del Escrutinio General y que el mismo no siga viéndose afectado por las

---

carácter de urgencia y celeridad que le imprime el Derecho Electoral a controversias de alto interés público de esta naturaleza. Cónsono con ello, tomamos conocimiento del contenido de las solicitudes y conforme a nuestra facultad legal de *motu proprio* certificar recursos pendientes ante foros inferiores, así procedimos.

interpretaciones encontradas dadas a la sentencia del foro primario.

Luego de ello, en cumplimiento con lo ordenado, las restantes partes comparecieron ante este Foro.

## II

No debe existir duda alguna que la emergencia electoral que tenemos ante nuestra consideración es una de alto interés público y que requiere la pronta, oportuna y efectiva intervención de este Tribunal. Prácticamente, tenemos el proceso de Escrutinio General paralizado y con ello nuestra democracia. Todo surge a raíz de las distintas interpretaciones dadas por los componentes electorales a un dictamen del foro primario relacionado con la entrega de las listas de los electores que votaron en todas las modalidades de voto ausente y adelantado.

Ante el escenario al que hoy nos enfrentamos, resulta imperativo asumir sin dilación alguna nuestra facultad para certificar el caso ante la consideración del Tribunal de Primera Instancia, _Valentín Rivera v. Rosado Colomer_, SJ2020CV06084. De igual forma, haremos por este medio lo propio con la solicitud de certificación del Presidente de la CEE.

Por tanto, **se declara ha lugar la Petición de Certificación presentada por el Presidente de la CEE, sin trámite ulterior de conformidad con la Regla 50 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B, R. 50, y se consolida con el CT-2020-24.**

## III

Como es sabido, el derecho al voto es una de las garantías fundamentales de nuestro sistema democrático de gobierno. PPD v. Admor. Gen. De Elecciones, 111 DPR 199, 207 (1981). A tales efectos, nuestra Constitución establece expresamente que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el **sufragio universal, igual, directo y secreto**, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". (Énfasis suplido). Art. II, Sec. 2, Const. PR, LPRA, Tomo 1.

Con tal mandato constitucional como norte, el Código Electoral regula todo lo concerniente a los procesos electorales. De este modo, el Código Electoral reconoce como derechos de los electores, entre otros, los siguientes:

(1) El derecho a la libre emisión del voto y a que este se cuente y se adjudique conforme a la intención del Elector al emitirlo, y según se dispone en esta Ley.

(2) La supremacía de los derechos electorales individuales del ciudadano sobre los derechos y las prerrogativas de todos los Partidos, Candidatos Independientes y agrupaciones políticas.

(3) La administración de los organismos electorales de Puerto Rico dentro de un marco de estricta imparcialidad, uniformidad, pureza, transparencia y justicia.

(4) La más amplia accesibilidad del Elector, sin barreras y sin condiciones procesales onerosas, a toda transacción y servicio electoral, incluyendo el ejercicio de su derecho al voto.

(5) El derecho del Elector a que el sistema y los procedimientos electorales estén fundamentados en su más amplia participación y accesibilidad, tomando en consideración su dignidad y su credibilidad personal, y no en

la desconfianza de los Partidos Políticos u otros electores.

(6) El derecho a un sistema electoral moderno y tecnológicamente avanzado con opciones que faciliten la realización de las transacciones electorales y el ejercicio del voto a distancia y en tiempo real. Art. 5.1 del Código Electoral, supra.

Como parte de estas salvaguardas, el Código Electoral dispone que, aunque los registros, escritos, documentos, archivos y materiales de la Comisión son documentos públicos y que pueden ser **examinados** por cualquier Comisionado Electoral o persona interesada, "**la Comisión no proveerá a persona alguna copia del Registro General de Electores y sus versiones electrónicas, y tampoco de las tarjetas de identificación electoral, papeletas, actas de escrutinio o las hojas de cotejo oficiales que hayan de utilizarse en una votación.**"(Énfasis suplido). Art. 3.6 del Código Electoral, supra.

A su vez, con el elector como eje del sistema electoral, el Código Electoral reconoce e instrumenta lo que sería el voto ausente y el voto adelantado. Así, las personas que se vean impedidas de acudir a los eventos electorales físicamente cuentan con estas modalidades de votar. Véase, Artículos 9.34 al 9.39 del Código Electoral, supra. La Junta Administrativa de Voto Ausente y Adelantado (JAVAA) es el ente electoral a cargo de administrar el proceso de solicitud, votación y adjudicación de los Votos Ausentes y Votos Adelantados. Art. 9.40, supra.

En lo pertinente a la controversia que nos ocupa hoy, algunas de estas modalidades de votar se pueden

ejercer mediante el correo postal, lo cual está detalladamente regulado en el Código. El proceso comienza con el envío de la papeleta a los electores mediante el Servicio Postal de los Estados Unidos (USPS, por sus siglas en inglés). Art. 9.36(2), supra; Art. 9.39 (3), supra. Una vez recibida la papeleta, el elector devolverá la papeleta a la CEE mediante el correo postal, la cual deberá recibirse en o antes del último día del Escrutinio General. Nótese la **imposibilidad fáctica** de tener listas finales **actualizadas** previo al Escrutinio General. En ese sentido, la necesidad de suplementación continua durante el escrutinio general resulta evidente.

Como medida cautelar de evitar la doble votación, el Código Electoral ordena que todo elector que cumpla con el proceso de solicitar el voto adelantado o ausente, aparezca en la lista impresa de electores del colegio de su inscripción con un código representativo de que votó adelantado o ausente, para así evitar que vote en el colegio a la fecha de la elección. Arts. 9.36 y 9.39 del Código Electoral, supra.

Por su parte, el Reglamento de voto ausente y voto adelantado de primarias 2020 y elecciones generales y plebiscito 2020, 13 de marzo de 2020, dispone que las solicitudes de voto adelantado y ausente se ingresarán a modo digital para la impresión de las listas de los solicitantes al cierre del registro, las cuales se entregarán al representante de cada partido político veinte (20) días antes de la Elección General. Sec. 2.3(D)(6), supra.

Por su parte, y concerniente a los recursos ante nuestra consideración, el Artículo 10.7 del Código Electoral, supra, regula y establece unos parámetros para la adecuada administración del Escrutinio General al disponer como sigue:

(1) Inmediatamente después que la Comisión reciba todas las papeletas y materiales de una votación, procederá a realizar un Escrutinio General. La persona que estará a cargo del Escrutinio General será seleccionada por el Presidente, pero requerirá la ratificación unánime de los Comisionados Electorales de los Partidos Políticos, Partidos por Petición y los Candidatos Independientes que fueron certificados por la Comisión para participar en el evento electoral.

(2) **El Escrutinio General se realizará utilizando solamente las Actas de Escrutinio de cada Colegio de Votación. La Comisión corregirá todo error aritmético que encontrare en un Acta de Escrutinio y la contabilizará en su forma corregida.**

(3) Si la Comisión no pudiera corregir los errores encontrados en un Acta de Escrutinio emitida por el sistema de votación electrónica o la máquina de escrutinio electrónico, o si hubiere una discrepancia entre la cantidad de votantes reflejada en la lista de votación, sea impresa o electrónica, y las papeletas escrutadas en el colegio de votación o en JAVAA por uno de los sistemas electrónicos, se deberá, por vía de excepción, recontar todas las papeletas del colegio de votación cuya acta refleje discrepancia.

(4) **Durante el Escrutinio General solo se intervendrá con las papeletas protestadas, recusadas, no adjudicadas, los votos añadidos a mano y los votos ausentes y adelantados recibidos por correo.** Estas papeletas serán evaluadas por la Comisión para su adjudicación o anulación. **Una vez comenzado, el Escrutinio General continuará ininterrumpidamente hasta su terminación, excepto por los días de descanso que autorice la Comisión.**

(5) El resultado final y oficial surgirá solo del Escrutinio General o el Recuento, cuando este último aplique, y deberá ser certificado por la Comisión, el Presidente y anunciado y publicado por este. Ese resultado será definitivo, mientras

no haya sentencia final y firme de un Tribunal en contrario. (Énfasis suplido).

Como se puede apreciar, el Código Electoral es diáfano al establecer que en el proceso del Escrutinio General sólo se utilizarán las Actas de Escrutinio de cada Colegio de Votación.[6] Ello se refiere al proceso general de los votos emitidos físicamente en los respectivos colegios electorales. A lo que añade que sólo se intervendrá con las papeletas protestadas, recusadas, no adjudicadas, los votos añadidos a mano y los votos ausentes y adelantados recibidos por correo. Es decir, que en el proceso del Escrutinio General sólo se contará con las actas mencionadas, a excepción de las instancias establecidas por el Código Electoral, que incluyen los votos añadidos a mano y los votos por correo.

De igual importancia, el Código Electoral es más enfático aún al precisar de manera categórica que, una vez se comience con el Escrutinio General, éste no podrá ser interrumpido, salvo los días de descanso. Art. 10.7(4), supra. Tal mandato es reafirmado posteriormente en el Artículo 13.4 del Código Electoral el cual precisa que "[e]n ningún caso, una decisión del Tribunal de Primera Instancia o la revisión por el Tribunal de Apelaciones de una orden, decisión o resolución de la Comisión tendrá el efecto de suspender, paralizar, impedir u obstaculizar la votación, el escrutinio o el escrutinio general de cualquier votación".

---

[6]El término "Acta de Escrutinio de Colegio" es definido en el Código Electoral como el "[d]ocumento en el que se consigna el resultado oficial del escrutinio de votos en un colegio de votación". Art. 2.3(1), supra.

Por último, el Código Electoral también regula el proceso de los electores añadidos a mano. Específicamente, el Artículo 9.15 dispone que:

> En cada centro de votación de Unidad Electoral, se establecerá un colegio especial para electores que no hayan sido incluidos en las listas de votantes y reclamen tener derecho al voto. Para votar Añadido a Mano, el Elector deberá demostrar su identidad proveyendo a los funcionarios de este colegio su Tarjeta de Identificación Electoral u otra de las identificaciones personales autorizadas por esta Ley para propósitos electorales. La Comisión reglamentará los demás requisitos y los procedimientos para garantizar el derecho al voto a esos electores con identidad verificada.

A esos fines se aprobó el <u>Manual de Procedimientos de la Unidad de Añadidos a Mano Elecciones Generales y Plebiscito 2020</u>, de 11 de noviembre de 2020. En este se explica que el procedimiento de añadidos a mano es un mecanismo disponible para los electores que no aparecen en las listas de votación por un alegado error administrativo de la CEE y quieren ejercer su derecho al voto, lo cual se les permite, pero luego de una investigación se determina si se le debe adjudicar el voto.

Así, el Manual establece en su introducción que:

> En la CEE se ha establecido la Unidad de Añadidos a Mano en el Escrutinio General o Recuento con el propósito de investigar los casos de los electores que votaron en el colegio especial de añadidos a mano de cada una de las unidades electorales en cada institución penal y juvenil en aquellos Hospitales designados por la Comisión y las diferentes modalidades de voto adelantado, además, los sobres recusados.

Como parte de tal proceso se detalla que corresponde agrupar los casos a ser investigados en casos activos e inactivos. En cuanto a los activos dispone:

a)   Cotejarán   los   activos   contra   las Certificaciones de "exclusiones", listas de voto por correo, voto a domicilio, voto adelantado en el precinto y voto ausente. De esta forma se podrá determinar si votaron adelantado, ausente, en colegio fácil acceso, domicilio o excluido por cualquier otra causal. Todo caso activo que aparezca en dichos listados de exclusión será rechazado siempre y cuando no haya un documento que demuestre lo contrario (Certificación de Inclusión de Secretaria). Art. IV(3)(c)(1)(a).

## IV.

Las controversias ante nuestra consideración reflejan que el lenguaje contenido en la Sentencia emitida por el Tribunal de Primera Instancia ha sido objeto de diversas interpretaciones en cuanto a su alcance y sus efectos en el Escrutinio General. A fin de cuentas, esta divergencia de interpretaciones ha ocasionado una impermisible paralización *de facto* de todo el proceso de Escrutinio General, lo cual no podemos permitir por ser una consecuencia jurídica prohibida en ley. Este Tribunal no va a permitir que ninguno de los participantes del Escrutinio General tenga un poder de veto para atrasar la implantación del mandato de todos los electores.

Por consiguiente, este Tribunal tiene como norte que este ciclo electoral culmine de la manera más ágil y transparente ante los ojos de nuestro Pueblo. Ese ha sido el rol de este Tribunal en la historia de este ciclo electoral y así continuaremos descargando nuestra responsabilidad de trazar la ruta de garantizar que no se atrase irrazonablemente la certificación final de los candidatos electos, a fin de que cumplan con el mandato del Pueblo.

Ante este escenario, resulta mandatorio precisar el alcance de la aludida Sentencia a los fines de que sea

cónsona con los procedimientos ordinarios del Escrutinio General instrumentado por el Código Electoral. A su vez, debemos aclarar y particularizar varias medidas cautelares necesarias, a nuestro juicio, sobre este asunto. No menos importante, no debe existir margen de discreción alguno que permita que alguno de los actores del proceso electoral intente descarrilar la voluntad del Pueblo o atentar contra los postulados constitucionales que protegen el derecho al voto. **Reiteramos que este Tribunal no tolerará que intereses partidistas o particulares pretendan desnaturalizar el proceso ordinario del Escrutinio General con la introducción de mini juicios y otras prácticas dilatorias.**

Según reseñamos, el Código Electoral recoge detalladamente en su Artículo 10.7, <u>supra</u>, el propósito, la naturaleza y el método del Escrutinio General. En lo que más nos atañe, allí se especifica que el proceso de Escrutinio General no puede ser paralizado. En ese sentido, la administración del proceso tiene que enmarcarse en los parámetros de ese articulado, el cual delinea que en el Escrutinio General lo que se utilizan son las Actas de Escrutinio de cada Colegio de Votación y que sólo se intervendrá, entre otros asuntos, con los votos añadidos a mano y los votos ausentes y adelantados recibidos por correo.

Aunque no tenemos duda de que la intención del foro de instancia no fue paralizar los trabajos del Escrutinio General, el tracto procesal acontecido con posterioridad ha tenido el efecto de mantenerlo paralizado. A modo de ejemplo, la reproducción de seis (6) copias de cada lista

sin que se comience el Escrutinio General es una acción que dilata irrazonablemente el inicio del mismo. Como también señalamos, el Código Electoral expresamente rechaza la paralización del Escrutinio General, por lo que tales trabajos tienen que continuar su marcha. Así, apercibimos que ningún funcionario, en ninguna de sus categorías, puede interferir o dilatar injustificadamente el Escrutinio General que se lleva a cabo.

**V.**

Por tanto, en esta etapa de certificación, al atender la moción de reconsideración presentada por el Comisionado Electoral del PNP, así como las solicitudes de certificación presentadas por este último y el Presidente de la CEE, junto con las sugerencias de medidas protectoras, y los escritos de todas las partes comparecientes, se precisa el alcance y los efectos de la sentencia del Tribunal de Primera Instancia. De este modo, ordenamos y disponemos lo siguiente:

(1) El Escrutinio General, según mandata el Código Electoral, **no** podrá ser paralizado, excepto por los procesos de descanso rutinario. Así, el escrutinio operará de forma continua y ágil; garantizando que se cuente todo voto emitido por elector autorizado en Ley para ejercer dicho voto y que el escrutinio se culmine en un término razonable. Los Comisionados Electorales de todos los partidos políticos en propiedad que componen el pleno de la CEE y sus representantes en el proceso de escrutinio, deberán actuar proactivamente para que el

Escrutinio General continúe ininterrumpidamente. **Esta actuación deberá incluir el proveer la presencia de sus funcionarios en las correspondientes mesas de escrutinio, al momento de comenzar los trabajos cada día y hasta el cierre de operaciones de dicho día, y que los mismos procedan con el escrutinio. Se entenderá que el partido que no tenga sus funcionarios presentes está renunciando a su representación en balance en la mesa correspondiente.**

(2) Este Tribunal no va a permitir la paralización o el poder de veto de ningún partido por encima del mandato del Pueblo y de los procesos instrumentados en Ley. En ese sentido, se instruye a la CEE que no podrá paralizar la totalidad de las mesas donde se realiza el Escrutinio General y que cualquier divergencia en una mesa particular se atenderá a base de los niveles jerárquicos que establecen las normas reglamentarias de la CEE.

(3) En la medida en que se detecte que un votante ha emitido voto adelantado y voto añadido a mano, se deberá referir dicho asunto al pleno de la CEE para que pueda atender el asunto. La CEE referirá a las agencias de investigación, tales como el Departamento de Justicia estatal y federal y cualquier otra agencia con capacidad similar, para que realicen la pesquisa que corresponda y, de ser necesario, se procese dicha situación.

(4) El hallazgo de un intento de doble votación, no evitará que continúe el Escrutinio General, procediendo con la exclusión del voto emitido en el colegio de añadido a mano del elector en controversia. Una vez

remitida la situación al pleno de la CEE, se continuará el proceso de escrutinio en la mesa.

(5) Las listas de cada precinto serán divulgadas a los funcionarios electorales concernidos cuando se abra el maletín correspondiente a ese precinto.

(6) En atención a las órdenes protectoras solicitadas, se dispone que solamente los funcionarios de las mesas correspondientes tendrán acceso a la lista concernida y que sea objeto de trabajo del precinto en particular.

(7) A fin de salvaguardar la secretividad del derecho al voto y con ello las garantías de confidencialidad sobre la información sensitiva protegida por el ordenamiento estatal y federal, **se prohíbe el traslado de las aludidas listas fuera del área de la sede del Escrutinio General.**[7] Esto se hace para salvaguardar los derechos de todos los electores.

(8) Una vez culminado el Escrutinio General, las listas objeto de controversia en este recurso serán custodiadas por la Comisión y su uso ulterior tendrá que ser sustentado en derecho.

(9) A fin de no desvirtuar la naturaleza del Escrutinio General, se precisa que los representantes de los cinco (5) partidos tendrán acceso a las listas sin necesidad de reproducir cinco (5) copias adicionales a cada uno de los partidos. De ese modo, se permitirá una

---

[7]Precisamente, ese es el reclamo de varios electores que alegan emitieron su voto por adelantado y solicitan intervención en este pleito judicial para salvaguardar sus derechos constitucionales. **Así, se declara con lugar, en ese extremo la <u>Moción de intervención bajo la Regla 21.1 de Procedimiento Civil</u>,** presentada por la Sra. Julia Eva Pesquera Morales y otros.

sola copia, adicional a la lista original. Una vez utilizada, la copia será decomisada y la lista original custodiada conforme a lo ordenado en el inciso anterior.

(10) Reiteramos que la discrepancia en una mesa no será óbice para paralizar la totalidad del Escrutinio General; tampoco el retiro voluntario o por falta de recursos humanos de cualquier partido político.  En caso de que uno o varios partidos políticos retiren a su personal o no se presenten por falta de recursos humanos, será deber del Director de Escrutinio  y de los miembros de la Comisión, garantizar que los representantes del partido político o los partidos políticos restantes continúen el proceso de escrutinio junto a un representante del interés público, cuya designación recae en el Presidente de la Comisión Estatal de Elecciones.

(11) **Apercibimos a todos los funcionarios electorales que laboran o son voluntarios en el Escrutinio General que el incumplimiento con lo aquí ordenado por este Tribunal conllevará el referido para el inicio de un procedimiento de desacato y el referido a las autoridades estatales y federales pertinentes.**

Así modificada, se confirma la Sentencia del Tribunal de Primera Instancia y se instruye a la CEE y a todos sus componentes el fiel cumplimento con lo ordenado en esta Opinión y Sentencia.

Notifíquese inmediatamente por correo electrónico y por la vía telefónica esta Opinión Per Curiam y Sentencia a todas las partes.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>    Peticionario<br><br><br>       v.<br><br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>    Promovidos | CT-2020-0024<br>Cons.<br>CT-2020-0025 | |
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>    Recurridos<br><br><br>       v.<br><br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>    Peticionarios | | |

SENTENCIA

San Juan, Puerto Rico, a 23 de noviembre de 2020.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, en esta etapa de certificación, al atender la moción de reconsideración presentada por el

Comisionado Electoral del PNP, así como las solicitudes de certificación presentadas por este último y el Presidente de la CEE, junto con las sugerencias de medidas protectoras, y los escritos de todas las partes comparecientes, se precisa el alcance y los efectos de la sentencia del Tribunal de Primera Instancia. De este modo, ordenamos y disponemos lo siguiente:

(1) El Escrutinio General, según mandata el Código Electoral, **no** podrá ser paralizado, excepto por los procesos de descanso rutinario. Así, el escrutinio operará de forma continua y ágil; garantizando que se cuente todo voto emitido por elector autorizado en Ley para ejercer dicho voto y que el escrutinio se culmine en un término razonable. Los Comisionados Electorales de todos los partidos políticos en propiedad que componen el pleno de la CEE y sus representantes en el proceso de escrutinio, deberán actuar proactivamente para que el Escrutinio General continúe ininterrumpidamente. Esta actuación deberá incluir el proveer la presencia de sus funcionarios en las correspondientes mesas de escrutinio, al momento de comenzar los trabajos cada día y hasta el cierre de operaciones de dicho día, y que los mismos procedan con el escrutinio. Se entenderá que el partido que no tenga sus funcionarios presentes está renunciando a su representación en balance en la mesa correspondiente.

(2) Este Tribunal no va a permitir la paralización o el poder de veto de ningún partido por encima del mandato del Pueblo y de los procesos instrumentados en Ley. En ese sentido, se instruye a la CEE que no podrá paralizar la totalidad de las mesas donde se realiza el Escrutinio General y que cualquier divergencia en una mesa particular se atenderá a base de los niveles jerárquicos que establecen las normas reglamentarias de la CEE.

(3) En la medida en que se detecte que un votante ha emitido voto adelantado y voto añadido a mano, se deberá referir dicho asunto al pleno de la CEE para que pueda atender el asunto. La CEE referirá a las agencias de investigación, tales como el Departamento de Justicia estatal y federal y cualquier otra agencia con capacidad similar, para que realicen la pesquisa que corresponda y, de ser necesario, se procese dicha situación.

(4) El hallazgo de un intento de doble votación, no evitará que continúe el Escrutinio General, procediendo con la exclusión del voto emitido en el colegio de añadido a mano del elector en controversia. Una vez remitida la situación al pleno de la CEE, se continuará el proceso de escrutinio en la mesa.

(5) Las listas de cada precinto serán divulgadas a los funcionarios electorales concernidos cuando se abra el maletín correspondiente a ese precinto.

(6) En atención a las órdenes protectoras solicitadas, se dispone que solamente los funcionarios de las mesas correspondientes tendrán acceso a la lista concernida y que sea objeto de trabajo del precinto en particular.

(7) A fin de salvaguardar la secretividad del derecho al voto y con ello las garantías de confidencialidad sobre la información sensitiva protegida por el ordenamiento estatal y federal, se prohíbe el traslado de las aludidas listas fuera del área de la sede del Escrutinio General. Esto se hace para salvaguardar los derechos de todos los electores.[8]

(8) Una vez culminado el Escrutinio General, las listas objeto de controversia en este recurso serán custodiadas por la Comisión y su uso ulterior tendrá que ser sustentado en derecho.

(9) A fin de no desvirtuar la naturaleza del Escrutinio General, se precisa que los representantes de los cinco (5) partidos tendrán acceso a las listas sin necesidad de reproducir cinco (5) copias adicionales a cada uno de los partidos. De ese modo, se permitirá una sola copia, adicional a la lista original. Una vez utilizada, la copia será decomisada y la lista original custodiada conforme a lo ordenado en el inciso anterior.

(10) Reiteramos que la discrepancia en una mesa no será óbice para paralizar la totalidad del Escrutinio General; tampoco el retiro voluntario o por falta de recursos humanos de cualquier partido político. En caso de que uno o varios partidos políticos retiren a su personal o no se presenten por falta de recursos humanos, será deber del Director de Escrutinio y de los miembros de la Comisión, garantizar que los representantes del partido político o los partidos políticos restantes continúen el proceso de escrutinio junto a un representante del interés público, cuya designación recae en el Presidente de la Comisión Estatal de Elecciones.

(11) **Se apercibe a todos los funcionarios electorales que laboran o son voluntarios en el Escrutinio General que el incumplimiento con lo aquí ordenado por este Tribunal**

---

[8] Precisamente, ese es el reclamo de varios electores que alegan emitieron su voto por adelantado y solicitan intervención en este pleito judicial para salvaguardar sus derechos constitucionales. **Así, se declara con lugar, en ese extremo <u>la Moción de intervención bajo la Regla 21.1 de Procedimiento Civil</u>, presentada por la Sra. Julia Eva Pesquera Morales y otros.**

**conllevará el referido para el inicio de un procedimiento de desacato y el referido a las autoridades estatales y federales pertinentes.**

Así modificada, se confirma la Sentencia del Tribunal de Primera Instancia y se instruye a la CEE y a todos sus componentes el fiel cumplimento con lo ordenado en esta Opinión y Sentencia.

Notifíquese inmediatamente por correo electrónico y por la vía telefónica esta Opinión Per Curiam y Sentencia a todas las partes.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emite la siguiente expresión:

El fundamento de las opiniones disidentes de la Juez Asociada señora Rodríguez Rodríguez y del Juez Asociado señor Colón Pérez no es jurídico, lamentablemente. Es, en realidad, esto que aparece en el siguiente link: https://www.youtube.com/watch?v=-HuGpc3I_pw ".

La Jueza Asociada señora Pabón Charneco emitió la siguiente expresión de conformidad, a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón:

La protección del disfrute pleno de los derechos constitucionales no tiene descanso. Estos pueden ser vulnerados de noche, fuera de horas laborables o días festivos. Por ello, no cabe hablar de un Tribunal General de Justicia que cesa operaciones en estricto sentido. Más bien, se trata de una Rama de Gobierno que opera continuamente para salvaguardar los derechos que requieren de urgente atención. Como imperativo de nuestras funciones constitucionales no podemos pausar la consecución de la justicia. En otras palabras, no hay cabida para un "fin de semana largo" en nuestros calendarios. Asimismo, como Jueces y Juezas del Tribunal Supremo de Puerto Rico, y con pleno conocimiento de las responsabilidades que nuestro cargo conlleva, tenemos la obligación, dentro de nuestra capacidad humana, de estar disponibles por distintos medios para resolver las controversias que se nos presentan.

Mediante la Orden OAJP-2019-056, se decretó un cierre total de los tribunales el 20 de noviembre de 2020 por razones administrativas. Sin embargo, esto no impidió que

la parte peticionaria presentara electrónicamente a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC) un recurso de Certificación Intrajurisdiccional y una Moción Urgente en Auxilio de Jurisdicción sobre un asunto de alto interés público. Tampoco impidió la comunicación directa y constante entre todos los Jueces y las Juezas que componen este cuerpo colegiado a través de diversos medios y plataformas electrónicas, conforme ha sido nuestra costumbre durante la pandemia por coronavirus. Ciertamente la consideración de este asunto conllevó que algunos de nosotros detuviéramos actividades personales y familiares para examinar la controversia presentada, pero es que el cierre total decretado de ninguna forma debe dilatar nuestro deber de atender controversias, principalmente aquellas de índole electoral que pueden afectar derechos constitucionales o la estabilidad política del país.

Por otra parte, aprovecho para puntualizar que lo acordado por voto mayoritario durante el cierre administrativo fue expedir la Certificación Intrajurisdiccional y para nada se entró a resolver en los méritos la controversia. A fin de considerar la controversia en su fondo, todos los miembros de este Tribunal tuvimos el tiempo justo que ameritan estas controversias de alto interés público para estudiar detenidamente los planteamientos de las partes y, tras circularse la ponencia, determinar si estábamos o no de acuerdo con la postura promovida. De ahí que son ilusorias las expresiones de los compañeros que aluden a un atropellado curso de acción. Este Tribunal tiene la misma responsabilidad de actuar con el sentido de urgencia que le imparten nuestros jueces de instancia a controversias de esta naturaleza.

No podemos perder de perspectiva que las elecciones generales ocurrieron hace más de dos (2) semanas, y estando a casi un (1) mes de culminar el año, en este caso se justificaba un trámite judicial expedito. Las emergencias electorales no pueden esperar a ser evaluadas el próximo "día laborable"; deben atenderse con la celeridad que ameritan las circunstancias.

El Juez Asociado señor Kolthoff Caraballo emitió la siguiente expresión de conformidad:

Mejor que la sentencia de un tribunal es el acuerdo armonioso entre las partes. Ahora bien, un acuerdo requiere que la permanencia del conflicto no sea en realidad el propósito que se persigue, y que la buena fe realmente lo sea. Con relación a este asunto, esperamos no tener que volver a dictar sentencia.

La Jueza Presidenta Oronoz Rodríguez, la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez emitieron Opiniones Disidentes.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olvin A. Valentín Rivera, en su Capacidad Oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>Peticionario<br><br>v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>Recurridos | |
| Olvin A. Valentín Rivera, en su Capacidad Oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>Recurrido<br><br>v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, et als.<br><br>Peticionarios | CT-2020-0024 cons. con CT-2020-0025 |

Opinión disidente que emitió la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 23 de noviembre de 2020.

Otra vez Puerto Rico sufre la incertidumbre y la tensión a causa de los acontecimientos diarios en la Comisión Estatal de Elecciones (CEE). A tres semanas de las elecciones, la intranquilidad es dual: no se conoce con certeza quienes resultaron electos; y el proceso de conteo está plagado de irregularidades y contratiempos. Es evidente que no aprendieron la lección del proceso primarista atropellado y tortuoso que vivimos en agosto de 2020.

La confianza del pueblo en cada etapa del proceso electoral es indispensable para la integridad de cualquier elección. La democracia misma descansa en esa confianza. La ciudadanía tiene el derecho total de participar en las elecciones y conocer si el proceso electoral es válido o no. De no serlo, la ciudadanía puede --y debe-- cuestionar la pulcritud e integridad del mismo. Y es que para que los ciudadanos participen, entiendan, evalúen y finalmente acepten el resultado de un proceso electoral como representativo de su voluntad, la información electoral para contabilizar los votos legalmente emitidos tiene que estar accesible. Este es un imperativo fundamental del principio de transparencia para mantener y reforzar la confianza del público en las elecciones.

Resulta inaudito que, a estas alturas, el Presidente de la CEE se resista a reconocer que tiene que ceñirse a las disposiciones normativas que rigen para conceder certeza y preservar la pureza de los procesos. Ello se agrava cuando se sabía que, a raíz de la emergencia de salud pública y del recién aprobado Código Electoral el número de electores que solicitaría el voto adelantado se elevaría exponencialmente. En unas elecciones atípicas en las que el universo de votos adelantados o ausentes potenciales sobrepasa los 200,000,[9] urge garantizar que el

---

[9] Llama a la atención la cantidad significativa de electores que solicitaron emitir su voto por medio del mecanismo del voto ausente o del voto adelantado para los comicios generales de 2020 en comparación con los electores que emitieron sus votos de esa forma en las

proceso del escrutinio de todos los votos sea de cara al sol.

Eso es lo que se procura en este caso; un escrutinio de frente, transparente, pulcro en el cual se logre: (1) cotejar si todos los electores que votaron por adelantado solicitaron dicho voto; (2) asegurar que ningún elector votó dos veces y que, por ende, ningún elector cometió un delito; y (3) que se pueda adjudicar correctamente el voto añadido a mano que resta por contabilizar. Eso, por supuesto, con el imperativo de promover que el proceso electoral culmine de una vez.

Estoy de acuerdo con confirmar la determinación del Tribunal de Primera Instancia y con que no se paralice ni se obstruya del escrutinio general, no estoy conforme con las modificaciones que realiza este Tribunal y que tienen el efecto de limitar irrazonablemente el acceso a la

---

elecciones generales de 2016. Sobre el particular, el Comisionado del Movimiento Victoria Ciudadana expresó:

> Según información provista por la CEE a diversos medios de comunicación en el país, sobre 227,000 personas solicitaron voto adelantado o voto ausente para las elecciones generales de 2020. De esos solicitantes, ya la CEE ha reportado que un total de 169,364 personas votaron en las elecciones, según constan reportados los votos en las Unidades 74 (Voto Adelantado en Precinto) y 77 (Voto Adelantado a Domicilio, Voto Ausente y Voto por Correo). Dicha cifra, a la que aún falta sumar decenas de miles cTe votos correspondientes a unidades que la CEE reportó sin votos para la noche del evento, es seis (6) veces mayor que la emitida por este concepto en las elecciones de 2016 (26,936), y ya representa un 13.61% de la totalidad de votos reportados por la CEE para las elecciones generales de 2020, una cifra sustancialmente mayor que el 1.69% que dicha cifra representó para las elecciones generales de 2016. *Alegato del Comisionado Electoral del Movimiento Victoria Ciudadana*, págs. 9-10.

información necesaria precisamente para llevar a cabo ese proceso rigurosamente. Ante un escenario tan técnico y complejo, no contamos con la pericia para asegurar que lo que dispone el Tribunal en realidad asegurará que los funcionarios electorales puedan cotejar que los votos han sido adjudicados correctamente y que puedan verificar que en efecto no existen incongruencias en los votos emitidos. Confío en que, en consideración de las circunstancias, con la accesibilidad provista, los representantes de cada partido en las mesas correspondientes se encargarán de alertar sobre cualquier irregularidad detectada en el proceso.

Ahora bien, me distancio marcadamente de toda expresión del dictamen mayoritario que intime que un partido político no puede acudir a nuestros tribunales a exigir transparencia total y absoluta a los funcionarios gubernamentales responsables de viabilizar el ejercicio del derecho fundamental a votar.

Además, rechazo enérgicamente el tracto caótico y altamente irregular de este caso; máxime cuando nuestros propios reglamentos viabilizan atenderlo con la celeridad que exige el asunto, sin violentar nuestros propios reglamentos o darle un trato preferente a algunas partes. Aunque ciertamente estamos ante una controversia de alto interés público que amerita resolverse con premura, el proceder de este Tribunal al acoger un caso que no fue

válidamente presentado, en lugar de proveer confianza, lacera la imparcialidad que debe caracterizar a esta institución y termina arrojando más sombra y restándole fuerza a su determinación judicial.

I

De entrada, encuentro imperativo condenar el trámite atropellado, irregular y confuso mediante el cual este Tribunal acogió los recursos que hoy atendemos.

No hay duda que este Tribunal Supremo se considerará siempre abierto o disponible para los fines de expedir cualquier mandamiento. Así lo dispone expresamente la Regla 9 del Reglamento del Tribunal Supremo. No obstante, insistir que este Tribunal tiene la autoridad de "acoger" recursos que "recibió" sin que su Secretaría estuviera en funciones es contrario a la normativa y sienta un precedente peligroso.  No hay duda que tal proceder por parte de este Tribunal da la impresión y, de hecho, crea una clase privilegiada de ciudadanos o grupos con acceso al Tribunal en todo momento, mientras que para la extrema mayoría de los ciudadanos se les exige circunscribirse a los horarios de operación de la Secretaría o a la disponibilidad de un buzón de presentaciones, según dispuesto por orden administrativa.  Me explico.

La Regla 9 del Tribunal Supremo dispone que la Secretaría del Tribunal estará abierta al público desde las 8:30 a.m. hasta las 5:00 p.m.  Estos horarios pueden,

y como cuestión de hecho, se han extendido por orden administrativa. De esta manera, según dispone el Código Electoral de Puerto Rico de 2020, el 15 de octubre de 2020, se adoptó la OAJP-2020-068, mediante la cual anuncié las medidas judiciales habilitadas para atender asuntos electorales relacionados con las elecciones generales del 3 de noviembre de 2020. Entre otras disposiciones, la orden administrativa extendió los horarios de operaciones de los Centros Judiciales, del Tribunal de Apelaciones y el Tribunal Supremo, los que permanecerían abiertos en horario de 9:00 a.m. a 5:00 p.m. durante los fines de semana del 23 al 24 de octubre y el 30 al 31 de octubre de 2020, así como el día de las Elecciones Generales, celebradas el 3 de noviembre de 2020.

En la citada orden administrativa se consignó que la plataforma del Sistema Unificado de Manejo y Administración de Casos (SUMAC) se ampliaba para, además de recibir los casos electorales de naturaleza civil, recibir denuncias en casos electorales de naturaleza criminal. Al examinar esta orden administrativa, así como todas las órdenes adoptadas con el fin de expandir las materias atendidas mediante la plataforma del SUMAC, no puede albergarse duda alguna que estamos ante una plataforma para el manejo y la presentación de casos **ante el Tribunal de Primera Instancia**. El Reglamento del Tribunal Supremo no ha dispuesto para el perfeccionamiento

de ningún recurso que no sea por la vía ordinaria, es decir, su presentación en la Secretaría del Tribunal, siendo llamado el Secretario del Tribunal a ejercer las facultades de su cargo constatando que el caso no tiene defectos, asignándole el número que corresponda, entrándolo a los libros y turnando cualquier recurso para la atención inmediata del Tribunal, de tratarse de un auxilio de jurisdicción o recurso extraordinario, como sería el caso de una certificación intrajurisdiccional, conforme disponen las Reglas 23 y 24 del Reglamento del Tribunal Supremo. De hecho, aún en medio de la pandemia, este Tribunal no ha adoptado medida especial alguna que altere las normas exigidas para el perfeccionamiento de los recursos a ser presentados ante nuestra consideración.

Ante este trasfondo, no puedo estar de acuerdo con que este Tribunal "acoja" una Moción de auxilio de jurisdicción y una Petición de certificación intrajurisdiccional presentada por la representación legal del Comisionado del Partido Nuevo Progresista por la plataforma de SUMAC el viernes, 20 de noviembre de 2020 la cual ninguna Secretaría recibió ni tramitó como corresponde. Tampoco puedo si quiera concebir que se "acoja" y atienda otra Moción en auxilio de jurisdicción y Petición de certificación intrajurisdiccional presentada por la representación legal del Presidente de la Comisión Estatal de Elecciones un sábado, cuando nada se había

dispuesto sobre la disponibilidad de un buzón de presentaciones. Las puertas de un tribunal no pueden estar abiertas de forma selectiva para algunas partes, mientras el resto de la población tiene que regirse por las normas vigentes.

Comprendo que está en nuestra facultad atender con premura un asunto de alto interés público como el que se encuentra actualmente ante la consideración del Tribunal de Primera Instancia. Una mayoría de este Tribunal cuenta con mi apoyo para ejercer nuestras facultades y prerrogativas para, al amparo del Art. 3.002(f) de la Ley de la Judicatura de 2003, según enmendada, y el Art. 13.3 (4) del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, certificar motu proprio y traer de manera inmediata un asunto pendiente ante el Tribunal de Primera Instancia y que, a todas luces, es del más alto interés público. No existiendo limitación reglamentaria en cuanto al momento en que acordamos expedir un mandamiento, no tengo objeción a atender la pregunta o preguntas medulares en controversia y que se ventilan en el caso promovido por el Movimiento Victoria Ciudadana ante el Tribunal de Primera Instancia. Ello toda vez que coincido en que el Pueblo de Puerto Rico se merece que sus instituciones le brinden certeza sobre el ejercicio legítimo de su derecho al voto, y en consecuencia, se garantice una transición

pacífica, efectiva y adecuada a los funcionarios y funcionarias electos por este.

No obstante, distinto es certificar un asunto a petición de parte, cuando ningún recurso se ha perfeccionado conforme a derecho para nuestra atención. Es imperativo que nos abstengamos de utilizar de manera desmedida las facultades que ostentamos y evitemos sentar un precedente nefasto en un caso de tanta envergadura. Como institución, hemos adoptado reglamentación y normas internas que guían el ejercicio de nuestras facultades constitucionales y nuestra discreción, precisamente para que, al ejercerlas, no resulten arbitrarias o caprichosas. Así, nuestro proceder no debe levantar la más mínima duda de que actuamos de manera particular en reconocimiento de alguna casta o grupo privilegiado de litigantes con acceso irrestricto al Tribunal, mientras que a otras partes les exigimos el cumplimiento con las formalidades y normas procesales para que puedan lograr que sus reclamos sean elevados ante nuestra consideración.[10]

Habiéndose decretado un cierre administrativo para el viernes, 20 de noviembre de 2020, es preciso aclarar que este recurso no constituye un recurso de certificación intrajurisdiccional emitido a petición de parte alguna, ya que ningún recurso de esta naturaleza ha sido presentado

---

[10] Este tribunal, nuevamente en un acto altamente irregular, en un mismo acto: certificó, consolidó y resolvió una certificación. Ni siquiera se les dio oportunidad a las partes de refutar este escrito.

ante este Tribunal. Salvo que durante el horario regular de operaciones de la Secretaría estos recursos se perfeccionen conforme a la normativa reglamentaria que rige a este Tribunal. Ninguna Secretaría, ni la del Tribunal Supremo ni del Tribunal de Primera Instancia tramitó caso alguno para ser elevado a la atención del Tribunal con competencia. Es nuestra obligación mantener la ecuanimidad en las normas procesales que le exigimos a cada persona que toca nuestras puertas. Para ello, es imprescindible que cada persona se ciña a lo dispuesto en el Reglamento del Tribunal Supremo de Puerto Rico. Por ello, este Tribunal no debe tomar "conocimiento judicial" de los recursos aún no presentados ante el Tribunal Supremo o aparentar que actúa en base a comunicados de prensa, entrevistas en radio, reportes en las redes sociales u otros medios de comunicación masiva.

Finalmente, preciso destacar que como Jueza Presidenta soy la primera en promover la tecnología como mecanismo para garantizar el acceso a nuestros foros judiciales. En consecuencia, uno de los proyectos principales en el que trabaja la Oficina de Administración de los Tribunales es el desarrollo de una plataforma para la presentación electrónica de los recursos apelativos, a saber, tanto para el Tribunal de Apelaciones como el Tribunal Supremo. Ahora, en ausencia de esta plataforma digital para todos, sin distinción, no es permisible

cambiar las reglas del juego a mitad para favorecer a algunos. Las reglas del juego deben y tienen que ser las mismas para todos y conocerse de ante mano. Sólo así existe igualdad de condiciones para acceder a la justicia y vindicar nuestros derechos. El modo en que tanto el recurso del Comisionado del PNP y el del Presidente de la CEE llegan ante nuestra atención será una mancha indeleble sobre nuestra institución la cual, muy a mi pesar, resulta totalmente innecesaria. En nuestra carrera por tratar de salvar el desastre que ha sido la puesta en vigor de un Código Electoral aprobado a pocos meses del evento electoral, debimos haber sido firmes, juiciosos y mesurados en nuestro proceder, de manera que cualquier determinación que emitamos esté a la altura de lo que el Pueblo necesita y espera del más Alto Foro.

II

A.

Corresponde al sistema gubernamental estructurar el marco marco normativo legal y administrativo que "propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro". PSP v. Com. Estatal de Elecciones, 110 DPR 400, 405-406 (1980). Ello pues a través del voto, el pueblo le confiere legitimidad a nuestra sociedad democrática. Esos preceptos se consagran a raíz de la garantía constitucional que tiene cada

persona al sufragio universal, igual, directo y secreto. Const. PR, Art. II, Sec. 2, LPRA, Tomo I.

De esa forma, la Comisión Estatal de Elecciones (CEE) —como organismo responsable de planificar y dirigir los procedimientos electorales— tiene la obligación en Ley de "[g]arantizar que los servicios, procesos y eventos electorales se planifiquen organicen y realicen **con pureza, transparencia, seguridad, certeza, rapidez, accesibilidad** […] **libre de fraude y coacción**". (Énfasis suplido). Art. 3.1, Código Electoral.

Conforme a ese cuerpo normativo, el Presidente de la CEE es "la máxima autoridad ejecutiva y administrativa de la Comisión". Art. 3.8, Código Electoral. Así, este es "responsable de supervisar los servicios, procesos y eventos electorales **en un ambiente de absoluta pureza e imparcialidad**". (Énfasis Suplido). Íd. En el desempeño de esa encomienda, el Código Electoral le exige al Presidente de la CEE "[c]umplir y hacer cumplir las disposiciones de[l Código], la Constitución de Puerto Rico y de Estados Unidos de América", así como las disposiciones de "**los reglamentos electorales que, por virtud de ley, sean aprobados por la Comisión y los acuerdos unánimes de los Comisionados Electorales**". (Énfasis suplido). Art. 3.8(1), Código Electoral.

En virtud de esas exigencias estatutarias, la CEE y su Presidente están obligados a garantizar que los

mecanismos instados por virtud de Ley para promover la certeza y transparencia de los comicios se sigan rigurosamente. Ese deber ministerial es indudable. Este, a su vez, constituye un requisito indispensable para toda sociedad democrática.

Cónsono con ese principio, el *Reglamento de Voto Ausente y Voto Adelantado de Primarias 2020 y Elecciones Generales y Plebiscito 2020* (Reglamento de Voto Ausente) dispone que las subjuntas de la Junta Administrativa de Voto Ausente y Adelantado (JAVAA) están encargadas de, entre otras responsabilidades:

> Coordinar[] con la OSIPE la **entrada de datos para la impresión de las listas de solicitantes al cierre del registro de voto ausente y adelantado por categoría, de las cuales se entregará preferiblemente en formato digital al representante de cada partido político,** veinte (20) días antes de la celebración de la Primaria o Elección General y el Plebiscito. (Énfasis suplido). Sec. 2.3(D)(6), Reglamento de Voto Ausente.

El deber que se desprende de esa disposición garantiza que los representantes de cada partido político tengan ante sí herramientas que provean certeza y promuevan la pureza de los procesos electorales. En este caso en particular, no queda duda de que el Presidente de la CEE actuó conforme a su deber ministerial al conceder —por estipulación de este y de todos los Comisionados— una de las dos peticiones que hizo el Comisionado del Movimiento Victoria Ciudadana. Esto es, la entrega de una

lista final certificada por los representantes de la JAVAA de todos los partidos que comprendiera los electores que solicitaron el voto adelantado y el voto ausente para las elecciones generales del 2020.[11]

B.

Ahora bien, pertinente a la controversia ante nosotros, correspondía que determináramos si el Tribunal de Primera Instancia erró al exponer que existe un deber ministerial de entregar listas de electores que, al presente, se han identificado como que han votado por cualquiera de las categorías de voto adelantado o voto ausente.

Sobre el particular, el *Manual de Procedimientos de la Unidad de Añadidos a Mano Elecciones Generales y Plebiscito 2020* (Manual de Añadidos a Mano) viabiliza el mecanismo de los electores añadidos a mano, según lo permite el Art. 9.15 del Código Electoral. Estos son aquellos electores que no aparecen en la lista de votación del colegio al que acudieron a votar y que alegan que esa omisión corresponde a algún error administrativo por parte de la CEE. A estos electores se les garantiza la oportunidad de emitir su voto, sujeto al resultado de la investigación de rigor que se realice. El fin de esa investigación es determinar que ese elector, en efecto,

---

[11] Alegato del Comisionado Electoral del Movimiento Victoria Ciudadana, págs. 14-15. Según el Comisionado Electoral del Movimiento Victoria Ciudadana (MVC), la CEE entregó las listas certificadas el 18 de noviembre de 2020.

podía votar en ese colegio y evitar la duplicidad de los votos por un solo elector.

En lo pertinente, el Manual de Añadidos a Mano impone mecanismos para asegurar que un elector no haya votado dos veces. Lo anterior, por ejemplo, cuando un elector emite su voto a través del mecanismo del voto adelantado y, adicionalmente, se presenta a uno de los colegios a votar. Entre otros detalles, el Manual dispone la forma en que se investigará cada caso, dependiendo a cuál de dos categorías pertenece el elector que se persona: (1) electores activos, o (2) electores inactivos, excluidos o que no aparecen con récord en una primera búsqueda. El Manual dispone que cuando el elector está activo en el Registro General de Electores, la Junta:

> Cotejará[] los activos contra las Certificaciones de "exclusiones", **listas de voto por correo, voto a domicilio, voto adelantado en el precinto y voto ausente. De esta forma se podrá determinar si votaron adelantado, ausente, en colegio fácil acceso, domicilio o excluido por cualquier otra causal.** Todo caso activo que aparezca en dichos listados de exclusión será rechazado siempre y cuando no haya un documento que demuestre lo contrario (Certificación de Inclusión de Secretaría). (Énfasis Suplido). Art. IV(3)(c)(a).

De lo anterior se desprende que, para propósitos del mecanismo viabilizado para los electores Añadidos a Mano, es esencial que exista una lista en la que consten los electores de voto adelantado y ausente, por lo menos en las categorías que allí se disponen. ¿Cómo más se iba a determinar si un elector que emitió su voto mediante el

mecanismo de Añadido a Mano no votó también a través del voto adelantado o el voto ausente? Por lo tanto, para que la Junta de Añadidos a Mano pueda realizar efectivamente su labor, es imprescindible que esta cuente con la documentación pertinente que le permita verificar si ese voto puede adjudicarse. Lo anterior funciona como una medida para detectar el intento de fraude y preservar la transparencia de los procesos. En vista de lo anterior, es innegable que la CEE y su Presidente tienen el deber de asegurarse de que los funcionarios que forman parte del escrutinio, en representación de cada partido político, tienen acceso a las listas que permitan ejercer esas funciones.

### III

No existe duda de que el Código Electoral, supra, impone la necesidad de que el Escrutinio General transcurra de manera ininterrumpida hasta su terminación. Art. 10.7, Código Electoral. No obstante, los tribunales debemos estar disponibles para atender las controversias que surjan al amparo de los cuestionamientos *bona fide* que se levantan en aras de promover la transparencia en un año electoral que, desafortunadamente, se ha caracterizado por trazar un patrón de incompetencia administrativa sin precedentes en nuestra Isla. Aunque coincido con que los remedios que provee una Mayoría de este Tribunal promovería la movilización del escrutinio, es menester

reiterar que el interés de mantener cierta celeridad de los procesos no puede funcionar como un subterfugio para pasar por alto posibles violaciones o delitos que se identifiquen en el proceso. Precisamente, el Presidente de la CEE no hubiese entregado las listas certificadas de los electores que solicitaron el voto adelantado y el voto ausente —así como se le exige ahora que presente las listas correspondientes, en las instancias dispuestas por Ley— si el Comisionado del Movimiento de Victoria Ciudadana no hubiese presentado ante nuestros tribunales el recurso que originó la controversia que hoy atendemos.

En esa línea, es importante reiterar que la "onerosidad" o la incapacidad administrativa para proveer el acceso a información indispensable para que los representantes de los partidos lleven a cabo sus funciones como garantes del proceso no puede ser un impedimento --o servir de pretexto-- para facilitar un escrutinio transparente. Reitero, la CEE tiene que viabilizar el ejercicio del derecho al voto, pero además, tiene que garantizar la integridad del proceso para que su contabilización se de en un marco de **transparencia total**.

Tras el desasosiego y la vergüenza que ha causado todo este ciclo electoral, el Poder Judicial -como ha hecho antes-- tenía que proveer los remedios que devuelvan al Pueblo la confianza en nuestra capacidad de llevar a cabo estos ejercicios electorales sin mancha sobre sus

resultados. Revelar y hacer accesible la información para que los funcionarios electorales cuenten todos los votos, es el antídoto para hacer desvanecer cualquier sombra que se arroje sobre la pureza del proceso electoral. Que no quede duda. Este asunto no es de poca monta. Se trata del derecho fundamental que sirve como base para el resto de nuestros derechos.


                              Maite D. Oronoz Rodríguez
                                  Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana

Peticionario

v.

Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, *et als.*

Promovidos

Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana

Recurrido

v.

Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones, *et als.*

Peticionarios

CT-2020-0024
Cons.
CT-2020-0025

*Certificación Intrajurisdiccional*

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 23 de noviembre de 2020

> Lo que está involucrado, pues, es algo más profundo que la corrección del resultado en un caso u otro. Está en juego la percepción de la comunidad sobre la competencia y la legitimidad del Tribunal Supremo, ingredientes esenciales de cualquier democracia constitucional.

Efrén Rivera Ramos, *Las tendencias del Tribunal Supremo*
　　Cuando escribió su libro azul
　　rubén darío no era verde?
　　no era escarlata rimbaud,
　　góngora de color violeta?
　　y víctor hugo tricolor?
　　y yo a listones amarillos?
　　se juntan todos los recuerdos
　　de los pobres de las aldeas?
　　y en una caja mineral
　　guardan sus sueños los ricos?

Pablo Neruda, *cuando escribió su libro azul*

En época eleccionaria, sobre todo, desciende una densa nube de pigmento azul añil y se asienta sobre este Tribunal, nublando el entendimiento y discernimiento de la mayoría. ¡Qué mejor ejemplo que este caso!

Comienzo apuntando que NUNCA en mis dieciséis años en este Tribunal se había certificado una Resolución -particularmente en casos de gran resonancia- sin que se hiciera constar el criterio de quienes no estuvieron de acuerdo; siempre que las expresiones disidentes se circularan previo a que se certifique la Resolución. **Siempre se espera**, aunque ello suponga un retraso de la hora de certificación propuesta. Esa había sido la práctica inmemorial de ESTE Tribunal y sus jueces, por lo menos, hasta el viernes pasado.

En esta ocasión, la mayoría del Tribunal censuró la expresión disidente de los jueces que no estábamos contestes con el curso mayoritario, haciendo constar, erróneamente, que no habíamos intervenido. El disenso nuestro se basó en que, en propiedad, NO TENÍAMOS UN CASO

ANTE NUESTRA CONSIDERACIÓN, por lo que "acoger" la certificación de epígrafe era una actuación en claro menosprecio del Reglamento de este Tribunal.[12] Los casos se presentan ante este Tribunal en su Secretaría antes de las 5:00 pm. *Véanse*, Reglas 17 y 48 del Reglamento del Tribunal Supremo.[13] Tal parece que hay unos litigantes para con quienes la mayoría tiene una visión muy flexible de las disposiciones legales y reglamentarias aplicables. Si no teníamos un caso en propiedad, ¿qué certificamos? ¿un comunicado de prensa que algún juez leyó? ¿Por qué no esperar al día de hoy, cuando ya se había anunciado que se presentaría el caso ante este Tribunal?

El proceso atropellado de "acoger" la presente certificación el pasado viernes en la noche -carente de prudencia, viciado y contumaz de la mayoría- deslegitima la Opinión que hoy se certifica y empaña aún más la imagen de imparcialidad y seriedad de esta Institución.[14] No puedo

---

[12] La pretendida explicación contenida en la nota al calce cinco (5) resulta una excusa más patética que trágica.

[13] En el contexto de un recurso de revisión, este Tribunal había indicado lo siguiente interpretando nuestro Reglamento: "El recurso de revisión se formalizará presentado una solicitud en la Secretaría del Tribunal Supremo, **con exclusión de todo otro lugar o método es parte vital de las garantías de certeza, rectitud y seguridad que deben rodear todos los procedimientos judiciales.**" *Tim Manufacturing v. Shelley Enterprises*, 107 DPR 530, 534 (1978).

[14] Como miembros de la clase togada, les recordamos a los peticionarios que un recurso que tiene como propósito la revisión de actuaciones y determinaciones de un foro inferior ante un foro de mayor jerarquía no es una carta blanca para criticar sin fundamento las actuaciones del juez que presidió el caso. Ciertamente, el proceder del

ser partícipe de este fusilamiento sistémico de nuestras instituciones, que -como secuela del flujo y reflujo de la marea- hemos estado observando en años recientes.

En lo concerniente a los méritos de la controversia ante nuestra consideración, no hay duda: la interpretación judicial de este nuevo Código Electoral y sus reglamentos- el apego al texto y el amparo al espíritu de la ley o a otras consideraciones universales de *justicia*- dependerá de qué parte es la que saldrá favorecida ante cualesquiera de los exámenes a los que se someta la controversia. Sin ambages, ante estas circunstancias, el resultado predeterminado -**y no la normativa vigente o los principios básicos de Derecho**- traza el mapa y la estrategia. Ante cada controversia de naturaleza electoral, un puñado de jueces nos enfrentamos a un juego de laberinto en el cual ya sabemos qué nos espera luego de superados los escollos del camino. Esto, desde antes de adentrarnos al mismo: basta emplear un somero análisis de las partes de epígrafe. Si los postulados más elementales de la democracia desconvienen y se presentan como obstáculos… "*such is life*".

El ejercicio de hermenéutica y las consecuentes interpretaciones acogidas por la mayoría de este Tribunal al momento de resolver una controversia se presenta como

_____

foro primario no se desvió de los contornos de la normativa vigente y no constituyó una actuación comprendida dentro de lo que generalmente se cataloga como pasión, prejuicio o parcialidad.

consecuencia directa de la desastrosa redacción del Código Electoral de Puerto Rico de 2020. Al interpretar las disposiciones de éste, se sigue un patrón inconsistente e incoherente - ¡vaya contradicción! - que, analizado ante la totalidad de las circunstancias, no es fortuito. Veamos.

En *Gautier Vega et al. v. Com. Electoral PNP*, 2020 TSPR 124, 205 DPR ____ (2020), este Tribunal validó el acuerdo de los Comisionados Electorales que enmendaba el Art. 5.17 del Código Electoral de Puerto Rico de 2020 para extender el término para presentar recusaciones. Diez (10) días después, en *Suárez Molina v. Comisión Local de Elecciones de Cataño, et al.*, 2020 TSPR 129, 205 DPR____ (2020), este Tribunal -lo que bien se catalogó como un acto de malabarismo jurídico- resolvió que, ante el principio de especialidad, en los casos de una recusación contra un elector debía prevalecer el procedimiento particular establecido para la revisión de la decisión de la Comisión Local dispuesto en el Art. 5.16 del Código Electoral de 2020. Ello, a pesar de que dicho artículo contenía una frase que expresamente exceptuaba de su aplicación las recusaciones por domicilio.

Para llegar a esta conclusión, una mayoría de este Tribunal entendió que la inclusión de dicha excepción constituyó un error de redacción del legislador al copiar el texto de la ley anterior y que -sorprendentemente para

nadie- la verdadera intención del legislador respondía a la interpretación más cónsona con los argumentos presentados por el Comisionado Electoral del Partido Nuevo Progresista.

Por último, cinco (5) días después de resuelto lo anterior, este Tribunal emitió la Opinión de *Gautier Vega v. Comisión Estatal del Elecciones v. Sánchez Alvarado*, 2020 TSPR 131, 205 DPR ___. Nuevamente, nos encontrábamos ante una controversia en la que el infausto Código Electoral vigente carecía de respuesta que propendiera a solucionar una alegada disyuntiva. Ante la interrogante sobre el curso de acción a seguir en las instancias en las que los electores que emitieron su voto mediante correo postal omitieron incluir copia de una identificación válida, este Tribunal determinó que el proceder del Presidente de la Comisión Estatal de Elecciones (CEE) - enmendar el borrador del *Manual para el procedimiento de voto adelantado por correo para las Elecciones Generales y el Plebiscito de 2020* (Manual) a los efectos de concederles a dichos electores un plazo para subsanar esa deficiencia- fue válido y razonable.

Sin embargo, resulta inconcebible imaginar que durante la aprobación del Código Electoral de Puerto Rico de 2020 y su Reglamento no se previó el escenario que originó la controversia ante nuestra consideración: es decir, que el elector que ejerciera su derecho al voto por

correo no incluyera una copia de su identificación electoral o cualquier otra identificación con foto autorizada por el Código Electoral. De hecho, estoy convencida de que ese escenario fue ponderado y fue éste, precisamente, el detonante de la inclusión expresa de la advertencia que dictó que la validación de los votos recibidos por correo "estar[ía] sujeta a que el Elector haya incluido la copia de su tarjeta de identificación electoral o cualquier otra identificación con foto vigente autorizada por esta Ley". Art. 9.39 del Código Electoral de 2020. Esta disposición -que pretendía asegurar la pureza y confiabilidad en la emisión y adjudicación de votos adelantados por correo- se incluyó íntegramente en el *Reglamento de Voto Ausente y Voto Adelantado de 2020*, pero fue aniquilada por el Manual cuyo borrador fue enmendado de manera *ultra vires* por el Presidente de la CEE, y subsiguientemente aprobado.[15]

Así, ante la reiterada imposibilidad de interpretar y aplicar adecuadamente las disposiciones del nuevo Código Electoral, una mayoría de los integrantes de este Tribunal ha recurrido a arrogarse las funciones propias del Presidente de la CEE para dictaminar cómo han de

---

[15] Lo anterior, puesto que parecería ser que la figura del Presidente de la CEE, según en el Código Electoral de 2020, es la de un ser omnipotente y todopoderoso. *Véase* Art. 3.8 del Código Electoral de 2020, inciso 18. (donde se le confiere la facultad para "[r]ealizar todos aquellos otros actos necesarios y convenientes para el cumplimiento de esta ley".).

conducirse los procedimientos relacionados con el Escrutinio General. Esta presidencia *ad hoc* se instituye sin precedentes, sin jurisdicción y sin fundamento jurídico alguno. Cabe cuestionarse pues, si realmente se procuró aclarar el contenido de la orden dictada por el foro primario o si -por el contrario- la presunta falta de claridad de la orden constituyó el subterfugio idóneo para adquirir control de un proceso electoral plagado de irregularidades que no pueden ser subsanadas por un listado enumerado de instrucciones y amenazas inejecutables.

Resulta evidente, entonces, que si bien el Código Electoral aprobado precipitadamente fue diseñado para favorecer y garantizar determinados resultados electorales, ese diseño amañado que permite jugar con los dados cargados no ha podido ser administrado eficazmente por aquéllos que lo idearon, como lo han demostrado todas las controversias presentadas ante este Tribunal. Como se puede apreciar, las Opiniones emitidas por este Tribunal en materia electoral en estos pasados meses han tendido a favorecer las determinaciones de la Comisión Estatal de Elecciones y las posturas del Comisionado Electoral del Partido Nuevo Progresista, cuyos argumentos -curiosamente- resultan ser intercambiables, tal como si se tratara de Hidra de Lerna, el monstruo con varias cabezas de la mitología griega.

A la luz de lo anterior y tomando en cuenta lo que hemos venido observando a partir del evento electoral del 3 de noviembre, parece ser que el presidente Trump y su *afamado abogado*, Rudolph Giuliani, en esa búsqueda de timos o anomalías electorales en la que están inmersos, han perdido su tiempo buscándolas en los procesos de Georgia, Pennsylvania, Michigan o Arizona cuando sólo tenían que venir a Puerto Rico y allegarse a la Comisión Estatal de Elecciones para encontrarlas.

Por todo lo anterior, DISIENTO ENÉRGICAMENTE de las contorciones legales utilizadas para asumir jurisdicción sobre la presente controversia. Sin realmente pautar Derecho, la intervención de este Tribunal constituye más bien un ejercicio impropio de paternalismo judicial que se limita a emitir una especie de lista de cotejo con el único fin de dictar a la Comisión Estatal de Elecciones cómo ha de ejercer las funciones para las cuales fue creada y que justifican su existencia en nuestro ordenamiento electoral.


                              Anabelle Rodríguez Rodríguez
                              Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Olvin A. Valentín Rivera, en su capacidad oficial como Comisionado Electoral del Movimiento Victoria Ciudadana<br><br>Peticionario<br><br>v.<br><br>Hon. Francisco J. Rosado Colomer, en su capacidad oficial como Presidente de la Comisión Estatal de Elecciones; *et als.*<br><br>Promovidos | CT-2020-0024 *Certificación* Cons.<br>CT-2020-0025 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 23 de noviembre de 2020.

*Maletines apareciendo. Maletines por buscar.*

*Papeletas contadas. Papeletas sin contar.*

*Votos adjudicados. Votos sin adjudicar.*

*Actas cuadradas. Actas sin cuadrar.*

*Candidatos "ganadores" certificados. Candidatos ganadores sin certificar.*

*El fraude toca a las puertas. Algunos quieren permitirle entrar.*

*Una C.E.E. acéfala -- controlada en todas sus estructuras por el partido político en el poder, ello por disposición del nuevo Código Electoral -- mira hacia un lado. El silencio de la mayoría de un Tribunal.*

*Un gobierno ilegítimo, ¿el resultado final?*

Si irregulares son los procesos que se llevan a cabo en la Comisión Estatal de Elecciones -- cuyos directivos actuales ya nos tienen acostumbrados a actuar al margen de la ley --, más irregular fue la forma en la que una mayoría de esta Curia decidió acoger el recurso de certificación sobre el cual hoy nos expresamos. Un Tribunal Supremo en cierre administrativo (Orden Administrativa, OAJP-2019-056); un recurso que no se perfeccionó de acuerdo a las exigencias del Reglamento que dirige los procesos ante este Foro[16]; y, una *Resolución* emitida por este Tribunal el pasado 20 de noviembre de 2020 donde, en ánimo de llevar un mensaje incorrecto a la ciudadanía, se obviaron las expresiones emitidas por los jueces disidentes[17]; sirvieron de antesala para que, una vez más,[18] mis compañeros y

_____

[16] Los recursos que se presentan ante este Tribunal, como lo es un recurso de certificación, deben presentarse en la Secretaría de este Foro, de lunes a viernes, en o antes de las 5:00 p.m. Véanse, Reglas 17 y 48 del Reglamento del Tribunal Supremo, 4 LPRA Ap. XXI-B. En lo que respecta a este caso, ello todavía no ha sucedido aquí.

[17] En dicha *Resolución*, quien suscribe y la Juez Asociada señora Rodríguez Rodríguez hicimos constar la siguiente expresión, las cuales no fueron incluidas en el referido documento:

> "Disentimos del atropellado curso de acción seguido por una mayoría de este Tribunal en el presente caso, pues, al momento en que se emite esta Resolución, ningún miembro de esta Curia tiene ante su consideración el recurso de certificación al que nuestros compañeros y compañera de estrado hacen referencia. Lo anterior por no cumplirse aquí con lo dispuesto en el Reglamento del Tribunal Supremo de Puerto Rico."

[18] La primera ocasión fue en *Gautier Vega et al. v. Com. Electoral PNP*, 2020 TSPR 124, 205 DPR ___ (2020), donde este Tribunal validó un acuerdo de los Comisionados Electorales que, de manera *ultra vires*, enmendaba el Art. 5.17 del Código Electoral de 2020, 58 LPR 2020, causando así que se extendiera el término para presentar recusaciones.

Posteriormente, entiéndase aproximadamente una semana después, en *Suárez Molina v. Comisión Local de Elecciones de Cataño, et al.* 2020 TSPR 129, 205 DPR ___(2020), varios de mis compañeros y compañera de estrado resolvieron que el trámite para revisar una determinación adversa emitida por el presidente de una Comisión Local de Elecciones, en un proceso de recusación por domicilio, se llevaría a cabo conforme al procedimiento establecido para impugnar los demás tipos de recusaciones -- es decir, ante la Comisión Estatal de Elecciones --, lo cual es contrario a la excepción dispuesta en el Art. 5.16 del Código Electoral de 2020, *supra*.

compañera de estrado -- accediendo a los caprichos del Comisionado Electoral del Partido Nuevo Progresista, el señor Héctor Joaquín Sánchez Álvarez (en adelante, "señor Sánchez Álvarez") -- optasen por reescribir el ordenamiento electoral puertorriqueño, esta vez con el único fin de **limitarle** a determinados partidos políticos, pero muy en particular al Movimiento Victoria Ciudadana, el acceso a las listas actualizadas de los electores y electoras que solicitaron voto ausente y voto por adelantado en todas sus modalidades, así como las listas de electores y electoras que, en efecto, votaron bajo alguna de esas modalidades.[19]

De ese lamentable y errado proceder, -- mediante el cual una mayoría de esta Curia obvia todo trámite legal y

---

No siendo ello suficiente, el 28 de octubre de 2020 en *Gautier Vega v. Comisión Estatal de Elecciones*, 2020 TSPR 131, 205 DPR ___(2020), este Tribunal resolvió que la ausencia de la identificación del elector o electora al momento de enviar su voto adelantado por correo, no invalidaba el mismo sino que dicha deficiencia podía ser subsanada con posterioridad a ello; una vez la JAVAA así le notificara al respecto. Lo anterior, en clara contravención tanto del Código Electoral de 2020, *supra*, como el *Manual de Procedimientos para el Voto Adelantado por Correo*, cuerpos reglamentarios que requerían que identificación fuera enviada junto con la papeleta.

Procederes que, a todas luces, fueron incorrectos, por lo que nos vimos en la obligación de disentir.

[19] En específico, el partido Movimiento Victoria Ciudadana solicitó la siguiente información: (1) lista final de solicitudes de voto ausente y voto adelantado distribuidas por precinto, unidad y categoría; (2) total de papeletas enviadas y recibidas de Voto Ausente y Voto Adelantado por correo; (3) lista de solicitudes de viajeros recibidas entre el 1 y 4 de octubre de 2020; (4) lista de electores y electoras que votaron en todas las modalidades de Voto Adelantado; (5) número de solicitudes de Voto a Domicilio; (6) número de solicitudes de Voto Adelantado que fueron grabadas; (7) lista de solicitudes de Votos por Correo devueltos; (8) número de casos autorizados por JAVAA para recoger Votos a Domicilio manualmente; (9) lista de votantes adicionales de Voto a Domicilio; (10) desglose de todo lo contabilizado de Voto Adelantado por Precinto en cada modalidad.

reglamentario, con el único fin de adquirir jurisdicción en la causa de epígrafe -- enérgicamente disentimos. Ello, por si solo, sería razón suficiente para disponer del presente caso. Ahora bien, ante lo lamentablemente sentenciado por este Foro en la Opinión *Per Curiam* que hoy se emite, nos vemos en la obligación de expresarnos.

Al así hacerlo, tenemos bien presente que, en aras de intentar salvaguardar la pureza del evento eleccionario que se celebró en el País el pasado 3 de noviembre de 2020, en el caso de marras -- tal como correctamente lo ordenó el ilustrado Tribunal de Primera Instancia, por voz de la Hon. Rebecca de León Ríos -- procedía el acceso a las listas actualizadas de los electores y electoras que solicitaron voto ausente y voto por adelantado en todas sus modalidades, así como de aquellos electores que, en efecto, emitieron su voto a través de alguna de éstas, según fue solicitado por el Movimiento Victoria Ciudadana. Nada existe en el expediente de la causa de epígrafe que nos mueva a variar -- en esta etapa de los procedimientos -- ese criterio.

Y es que, contrario a lo alegado por algunas de las partes en el presente litigio, la Jueza De Léon Ríos nunca ordenó la paralización del escrutinio general que la Comisión Estatal de Elecciones (en adelante "C.E.E.") había comenzado. Aquí solo hacía falta que el Presidente de la C.E.E. ejecutara el claro mandato del foro

primario. Como no supo hacerlo, su *alter ego*, el Comisionado Electoral del P.N.P., señor Sánchez Álvarez, acude ante nos en busca de guías para poder hacerlo; pero, a su vez, busca también el permiso de esta Curia para limitar el alcance de la directriz que emitió el Tribunal de Primera Instancia. **Hoy -- con instrucciones y prohibiciones hechas a la medida de su solicitud y con advertencias que pudieran dar lugar al procesamiento criminal selectivo de los funcionarios y funcionarias que colaboran en el escrutinio general -- lo consiguió.**[20] Ello era totalmente innecesario. Eso era una tarea que, en consenso, como históricamente había sucedido en la C.E.E. en asuntos de similar naturaleza a los que hoy nos

---

[20] En particular, llamamos la atención a algunas, de las once (11) advertencias esbozadas en la Opinión *Per Curi*am:

> (1) [L]os Comisionados Electorales de todos los partidos políticos en propiedad que componen el pleno de la CEE y sus representantes en el proceso de escrutinio; deberán actuar proactivamente para que el Escrutinio General continúe ininterrumpidamente. **Esta actuación deberá incluir el proveer la presencia de sus funcionarios en las correspondientes mesas de escrutinio, al momento de comenzar los trabajos cada día y hasta el cierre de operaciones de dicho día, y que los mismos procedan con el escrutinio. Se entenderá que el partido que no tenga sus funcionarios está renunciando a su representación en balance en la mesa correspondiente.**

> (2) Este Tribunal no va a permitir la paralización o el poder de veto de ningún partido por encima del mandato del Pueblo y de los procesos instrumentados en Ley.

> […]

> (11) **Apercibimos a todos los funcionarios electorales que laboran o son voluntarios en el Escrutinio General que el incumplimiento con lo aquí ordenado por este Tribunal conllevará el inicio de un procedimiento de desacato y el referido a las autoridades estatales y federales pertinentes.** (Énfasis en el original).

Véase, Opinión Per Curiam, págs. 18-21.

ocupan, debieron haber realizado los Comisionados Electorales de los distintos partidos políticos representados en el mencionado organismo electoral.[21]

En la triste encrucijada que nuevamente se encuentra nuestro País, como consecuencia del atropellado evento electoral al que hemos hecho referencia,[22] secuela del accidentado proceso primarista que se vivió en la isla en el Verano de 2020, medidas como las que adoptó el foro primario a través de su *Sentencia*, son ese tipo de providencias que verdaderamente buscan darle vida a ese postulado constitucional que procura el garantizar "la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y [el proteger] al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral".[23] CONST. ELA art. II, § 2, LPRA,

---

[21] **Como cuestión de hecho, la noche del viernes, 20 de noviembre de 2020, mediante un acuerdo verbal unánime entre todos los Comisionados Electorales de los distintos partidos políticos, se había acordado continuar la celebración del escrutinio general y las reglas para ello. Lo anterior, es un dato que abona a la frivolidad del recurso ante nuestra consideración.** Véase, J. Colón Dávila, *Confiados tres comisionados electorales en que el escrutinio general comenzará esta tarde*, **El Nuevo Día (20 de noviembre de 2020),** https://www.elnuevodia.com/noticias/politica/notas/confiados-tres-comisionados-electorales-en-que-el-escrutinio-general-comenzara-esta-tarde/

[22] Véase, Colegio de Abogados y Abogadas de Puerto Rico, *Informe Cuerpo de Observadores Electorales: Elecciones Generales 3 de noviembre de 2020*, Apéndice I.

[23] La anterior cláusula constitucional impone a los funcionarios y las funcionarias gubernamentales a cargo de la dirección del País -- y en este caso, de la organización de los eventos electorales que se celebren en Puerto Rico -- una responsabilidad constitucional dual. *Aponte Rosario et al. v. Presidente de la Comisión Estatal de Elecciones*, 2020 TSPR 119, 205 DPR ___ (2020) (Colón Pérez, Opinión Disidente). De un lado, esos funcionarios y funcionarias tienen que abstenerse de interferir con el ejercicio del sufragio universal,

Tomo 1. La anterior decisión, sin lugar a dudas, fortalece nuestra democracia y, a su vez, es cónsona no solo con lo dispuesto en nuestra Carta Magna, sino también con todo lo establecido en nuestro ordenamiento jurídico -- en materia de derecho electoral -- para la atención del tipo de voto aquí en controversia.

Con ello, en sus alegatos ante esta Corte, coincidieron el Partido Popular Democrático, el Partido Independentista Puertorriqueño y el Movimiento Victoria Ciudadana. No podía ser de otra forma.

Recordemos que, con el fin de garantizar no solo el ejercicio del voto universal, igual y secreto, sino también la transparencia e integridad de los procedimientos que se realicen antes, durante y después de los comicios electorales, recientemente se aprobó la Ley Núm. 58-2020, conocida como el Código Electoral de 2020, 2020 LPR 58.[24] Dicho cuerpo de ley reglamenta las funciones y deberes del Presidente y todos los funcionarios y funcionarias de la Comisión Estatal de

_____

igual, directo y secreto, y, por otra parte, éstos tienen un deber afirmativo de proteger a los ciudadanos y ciudadanas contra toda coacción en el ejercicio de tal derecho. *PPD v. Gobernador I*, 139 DPR 643, 670 (1995). Véase, también, *Sánchez y Colón v. ELA I*, 134 DPR 445, 448-49 (1993).

[24] Al discutir las disposiciones del Código Electoral de 2020, *supra*, lo hacemos teniendo en mente nuestras expresiones a los fines de que el mencionado cuerpo de ley fue "[p]roducto de un proceso legislativo atropellado y carente de transparencia". *Suárez Molina v. Comisión Local de Elecciones de Cataño, et al., supra*. (Colón Pérez, opinión disidente). Como era de esperarse, "[l]a aprobación del nuevo Código Electoral, ha traído consigo una serie de controversias que han de atenderse teniendo como norte la pureza y confiabilidad del proceso electoral…". *Íd.*

Elecciones y demás organismos electorales, así como todo proceso que incida sobre la celebración de los referidos eventos. Véase, *Suárez Molina v. Comisión Local de Elecciones de Cataño,* 2020 TSPR 129, 205 DPR ___ (2020) (Colón Pérez, opinión disidente).

Así pues, y en lo relacionado a la controversia que nos ocupa, el inciso (3) del Art. 3.6 del precitado Código dispone que los registros, documentos, escritos, archivos y materiales bajo la custodia de la Comisión Estatal de Elecciones -- en papel o versiones electrónicas y digitales -- serán documentos públicos y podrán ser examinados por cualquier Comisionado Electoral o persona interesada. Art. 3.6 del Código Electoral de 2020, *supra*. Acto seguido, el inciso (3) aclara que la referida dependencia gubernamental no proveerá a persona alguna copia del Registro General de Electores y sus versiones electrónicas, y tampoco de las tarjetas de identificación electoral, papeletas, actas de escrutinio u hojas de cotejo oficiales que hayan de utilizarse en una votación. *Íd.*

Ahora bien, en su inciso (5) el discutido artículo, expresa que **"[l]os Comisionados Electorales [sí] tendrán derecho a solicitar copia de los documentos de la Comisión y éstos se expedirán libres de costo, dentro de los diez (10) días siguientes a la solicitud. Estas entregas solo se realizarán en copias de papel cuando no**

**estén disponibles en versiones electrónicas o digitales".** *Íd.* Ello, claro está, siempre y cuando no se trate de información que pueda revelar el candidato o candidata por el cual un ciudadano o ciudadana votó, pues dicha secretividad está protegida por la Sección 2 del Art. II de nuestra Constitución. CONST. ELA art. II, § 2, LPRA, Tomo 1; escenario no presente en el caso de marras, pues con su solicitud al foro primario el Movimiento Victoria Ciudadana no buscaba que se revelase CÓMO votaron los electores y electoras, sino más bien se revelase QUIENES fueron los electores que votaron y bajo qué modalidad lo hicieron. Ello, con el único fin de salvaguardar la pureza del evento eleccionario recientemente celebrado en nuestro País y evitar, a toda costa, un potencial fraude electoral.

Es decir, el Código Electoral, *supra*, es claro al establecer que a los Comisionados Electorales de los distintos partidos políticos con presencia en la C.E.E. se les puede proveer copia impresa o digital de los documentos de la referida dependencia gubernamental. El Art. 3.6 no impone trabas en cuanto a la cantidad, momento o lugar -- aunque sí el propósito o manera -- en que los Comisionados Electorales pueden utilizar las mismas pues, precisamente, por eso permite proveer copias ya sean **digitales o impresas**. En consecuencia, resulta absurdo argüir -- como se plantea en la Opinión *Per*

*Curiam* que hoy emite este Tribunal -- que las listas no pueden ser copiadas, que solo pueden ser utilizadas mientras estén custodiadas por la Comisión Estatal de Elecciones en el área donde se celebre el escrutinio general y que se permite una (1) sola copia por mesa.[25]

Dicho ello, conviene mencionar aquí que, con el fin de que la Junta Administrativa de Voto Ausente y Voto Adelantado (en adelante, "JAVAA") -- entidad que regula lo concerniente al proceso de solicitud, votación y adjudicación de todas las modalidades de voto ausente y

---

[25] Sobre el particular, la Opinión *Per Curiam* realiza una serie de advertencias, a saber:

[…]

(5) Las listas de cada precinto serán divulgadas a los funcionarios electorales concernidos cuando se abra el maletín correspondiente a ese precinto.

(6) En atención a las órdenes protectoras solicitadas, se dispone que solamente los funcionarios de las mesas correspondientes tendrán acceso a la lista concernida y que sea objeto de trabajo del precinto en particular.

(7) **[S]e prohíbe el traslado de las aludidas listas fuera del área de la sede del Escrutinio General**. Esto se hace para salvaguardar los derechos de todos los electores.

(8) Una vez culminado el Escrutinio General, las listas objeto de controversia en este recurso serán custodiadas por la Comisión y su uso ulterior tendrá que ser sustentado en derecho.

(9) A fin de no desvirtuar la naturaleza del Escrutinio General, se precisa que los representantes de los cinco (5) partidos tendrán acceso a las listas sin necesidad de reproducir cinco (5) copias adicionales a cada uno de los partidos. De ese modo, se permitirá una sola copia, adicional a la lista original. Una vez utilizada, la copia será decomisada y la lista original custodiada conforme a lo ordenado en el inciso anterior. (Énfasis en el original). Véase, Opinión *Per Curiam*, págs. 19-20.

voto adelantado[26] -- pudiese instrumentar los mencionados métodos de votación, el 13 de marzo de 2020 se aprobó el *Reglamento de Voto Ausente y Voto Adelantado de Primarias 2020 y Elecciones Generales y Plebiscito 2020* (en adelante, "Reglamento de Voto Ausente y Voto Adelantado"). Conforme a la Sección 2.3(B) de este reglamento, dicha Junta rendirá a la Comisión un informe estadístico semanal clasificado por precintos y categorías que contenga el total de solicitudes de voto ausente y voto adelantado aprobados. Sección 2.3 del Reglamento de Voto Ausento y Voto Adelantado.

De igual forma, la precitada sección creó tres subjuntas bajo la supervisión de JAVAA, a saber: (1) JAVAA voto ausente; (2) JAVAA votación adelantada; y (3) JAVAA votación adelantada frente a Junta de Balance Electoral. Dichos organismos tienen el deber de coordinar junto a la Oficina de Sistemas de Información y Procesamiento Electrónico (en adelante, "OSIPE"), la entrada de datos para la impresión de las listas de solicitantes del voto ausente y voto adelantado al cierre del registro y entregar a los representantes de los partidos políticos las mencionadas listas veinte (20) días antes de la celebración de la Elección General y el Plebiscito. *Íd.*

---

[26] Estas modalidades se encuentran estatuidas en los Arts. 9.34 al 9.39 del Código Electoral de 2020, *supra*.

En esa dirección, precisa discutir aquí que, en cuanto a los votos añadidos a mano, el *Manual de Procedimientos de la Unidad de Añadidos a Mano Elecciones Generales y Plebiscito de 2020* creó la Unidad de Añadidos a Mano con el fin de delegarle la realización del escrutinio general o recuento de esta modalidad. En su Sección IV (3), el referido Manual reconoce que, **en aras de determinar si algún voto añadido a mano fue emitido mediante alguna de las modalidades de voto ausente o voto adelantado, o por un elector o electora que haya sido excluido por cualquier otra razón, se requiere cotejar los casos de aquellos electores que aparezcan activo contra las certificaciones de exclusiones, así como las listas referentes a los votos adelantados o votos ausentes.**[27] Véase, *Manual de Procedimientos de la Unidad de Añadidos a Mano*, pág. 10.

Dicho de otro modo, del *Manual de Procedimientos de la Unidad de Añadidos a Mano* surge también el requisito y la necesidad de proveer, a los Comisionados Electorales de los distintos partidos políticos con presencia en la

---

[27] En apretada síntesis, y con el fin de ejemplificar la importancia de las mencionadas listas, aquella persona que solicitó voto adelantado o voto ausente pero que, finalmente, no pudo ejercitarlo a través de esas modalidades, no sería privada de su derecho al sufragio, pues el día de las elecciones podía acudir al colegio en cual constaba inscrito y emitir su voto. De ser ese el caso, su nombre debía constar en la lista de excluidos correspondientes a quienes solicitaron voto ausente y adelantado y, posteriormente, ésta o éste procedía a ejercer su voto en un colegio de electores añadidos a mano. Éste es uno de los escenarios en los que cobra relevancia el procedimiento contenido en el Manual de Procedimientos de la Unidad de Añadidos a Mano -- previamente discutido -- y por lo que resulta indispensable el acceso a las referidas listas ya que, entre otras cosas, se evita una posible doble votación.

C.E.E., las listas referentes a los votos adelantados o votos ausentes pues es mediante éstas, así como de otros documentos, que se evita una votación doble por parte de un mismo elector o electora. Consecuentemente, para realizar el escrutinio general no basta con proveer las actas de escrutinio de cada Colegio de Votación. Así lo acordaron los Comisionados Electorales al aprobar de forma unánime el precitado Manual.

En fin, y como hemos podido apreciar, la decisión emitida por el Tribunal de Primera Instancia en lo que respecta al caso ante nuestra consideración, siempre estuvo sostenida y apoyada por el estado de derecho vigente. De eso, no debe haber duda alguna. Solo hacía falta alguien que la instrumentara correctamente.

En ese sentido, como señalamos anteriormente, somos de la opinión que este Tribunal no debió haber intervenido con la decisión emitida por el foro primario. Mucho menos, si lo iba a hacer para -- entre otras cosas -- incluir determinadas prohibiciones y serias advertencias que pudieran dar lugar al procesamiento criminal selectivo de aquellos funcionarios o funcionarias que colaboran en el escrutinio general y que se vean en la obligación de detener el mismo en alguna mesa por entender que determinado voto, de los emitidos por nuestros electores y electoras el pasado 3 de noviembre de 2020, se emitió ilegalmente, y levante su

voz para así denunciarlo. Ese es, precisamente, el trabajo de nuestros funcionarios de colegio: **garantizar la pureza de los procesos electorales ante su consideración.** En esos escenarios no debe haber espacio para la censura, no al menos para el Juez que suscribe.

Es, pues, por todo lo anterior que enérgicamente disentimos del curso de acción seguido por una mayoría de este Tribunal en el presente caso.

## II.

Establecido lo anterior, -- y de conformidad con la normativa antes esbozadas --, urge, pues, que los partidos políticos representados en la C.E.E. tengan acceso a las listas de electores que ejercieron su derecho constitucional al voto mediante alguna de las categorías o modalidades de voto adelantado o ausente. Las referidas listas **-- las cuales deben ser divulgadas cuando se abra el maletín correspondiente a cada precinto electoral --** contribuirían a garantizar que personas que ejercieron su voto mediante alguna de estas categorías no hubieran, a su vez, votado el día de las elecciones en el Colegio correspondiente.

En unas elecciones ordinarias, en las que poco más de veinticinco mil (25,000) electores y electoras votan de manera adelantada o ausente, esa posibilidad es remota, y quizás está mayormente limitada a revisar las listas de electores que votaron añadidos a mano, para

evitar esas instancias. Sin embargo, en los comicios electorales celebrados el pasado 3 de noviembre de 2020, en los que -- dada la crisis de salud que enfrenta nuestra isla, como consecuencia de la pandemia del COVID-19 -- el voto adelantado o ausente sobrepasa los doscientos mil (200,000) electores o electoras, y en los cuales ya se han identificado escenarios en los que alguno de éstos o éstas solicitó voto adelantado o ausente y, además, emitió su voto en los colegios regulares[28] -- y no meramente en colegios añadidos a mano -- urge garantizar que los funcionarios y funcionarias de todas las colectividades tengan las herramientas que le permitan evitar posibles instancias de doble voto que dan paso a un potencial fraude electoral. A proveerles esas herramientas, es que los tribunales estamos llamados.

III.

Así pues, y a modo de epílogo, parafraseando las expresiones del Movimiento Victoria Ciudadana en su muy bien trabajado alegato ante este Tribunal, estamos seguros de que todo el País, incluyendo al Juez que suscribe,

> "[t]iene el deseo de que el escrutinio de las elecciones generales pueda llevarse a cabo con celeridad, pero también de una manera que permita que el escrutinio sirva para los fines para los que está contemplado y, más importante aún, que se de en circunstancias que permitan

---

[28] Véase, *Toñito Cruz asegura que tiene evidencia de miles de votos dobles*, Radio Isla, 20 de noviembre de 2020, disponible en https://radioisla.tv/tonito-cruz-asegura-que-tiene-evidencia-de-miles-de-votos-dobles11/ (última visita el 22 de noviembre de 2020).

al país confiar en sus resultados. En un cuatrienio con múltiples arrestos de [funcionarios públicos] por cargos de corrupción, a poco más de un año de la renuncia de un Gobernador y a meses de un proceso primarista plagado de quebrantos al compromiso constitucional con nuestro sistema electoral, y ante una cifra nunca antes vista de votos emitidos fuera del día de las elecciones generales, el camino para restituir la confianza del País en sus instituciones gubernamentales va por dar mayor transparencia al proceso electoral y no por afianzar su opacidad. En manos de este Tribunal queda[ba] esa posibilidad."


                              Angel Colón Pérez
                              Juez Asociado